NO. 07-03-0347-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

JULY 25, 2005

_____

JAMES FRANKLIN BROWN, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE
_____

FROM THE 410TH DISTRICT COURT OF MONTGOMERY COUNTY;

NO. 03-02-01113-CR; HONORABLE K. MICHAEL MAYES, JUDGE
_____

Before REAVIS and CAMPBELL and HANCOCK, JJ.

**MEMORANDUM OPINION**

James Franklin Brown appeals his conviction for the felony offense of murder and jury-assessed punishment of life imprisonment. Overruling the two issues appellant presents for our review, we affirm.

Factual and Procedural Background

The victim, twenty-year-old Brad Hawkins, occupied an apartment with his boyfriend, Matt Albertson. Appellant also stayed there. Other people often visited the apartment, and

drug use and sale were common occurrences. On May 15, 2002, Hawkins and Albertson were at the apartment with appellant, Rhonda Sellner, and another friend named Roland. During the evening Hawkins fell asleep on a couch while Albertson, Sellner and Roland went to a bedroom to use drugs.[1] Roland left early the next morning. Hawkins was still on the couch the next day, when Sellner and Albertson left to take Hawkins's dog to a veterinarian about 4 p.m., leaving appellant at the apartment. They returned with the dog within two hours. Sellner left about 7 p.m. and, on her return about 1 or 2 a.m. on the 17th, according to her testimony, Albertson and appellant met her at the door and "rushed" her to the bedroom, shutting the door. Albertson told her he knew Hawkins was "cheating" on him. Albertson and Sellner left together about 2:30 a.m., leaving appellant and Hawkins, still on the couch, at the apartment.

After several attempts to contact Hawkins by telephone, another friend, Jessica Jolly, went to the apartment in the early morning hours of May 18 and discovered Hawkins's body on the couch. Investigation showed Hawkins had been struck on the head with a baseball bat and shot. Based on the condition of the body, officers believed Hawkins was killed on Thursday, the 16th. Houston Police Department investigator Waymon Allen spoke with Roland the same day. Allen then took statements from Sellner and Albertson. Appellant called Allen to talk about the investigation. Appellant accepted Allen's offer of a ride to the station.

---

[1] Appellant did not participate in the drug use.

The first of three recorded interviews of appellant by Allen began about 4:30 p.m. on May 19th.[2]  Appellant was told he was not required to speak with the officers and was free to leave but not advised of his constitutional rights in accordance with *Miranda v. Arizona*,  384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).  After initially denying any knowledge of how Hawkins died, appellant later claimed Albertson killed Hawkins by striking him with a baseball bat, then shooting him with a rifle.  He also admitted to taking Hawkins's car and computer.  He offered to show the officers where he left the car.  The recorded interview ended approximately 7:30 p.m. Appellant agreed to ride with officers to Liberty County to locate the car.  Allen's testimony indicates appellant assisted officers in finding the car at a location in Liberty County, and in finding the residence in Hardin County at which the computer was located, but appellant has not contested the officer's assertion he was not questioned about the murder during this trip.

After recovering the car, Allen considered appellant to be in custody.  On their return to Houston appellant was taken before a magistrate and advised of his constitutional rights about 4:30 a.m. on Monday, May 19th.  Allen also gave appellant *Miranda* warnings before the second interview, which took place at 4:45 a.m. in Allen's car outside the jail.  This session primarily consisted of appellant reaffirming the statements made in the first interview, including his position that Albertson was the person responsible for Hawkins's death.  Leaving appellant at the jail, Allen drove to Galveston and reinterviewed Albertson.  On returning he conducted the third interview with appellant at the jail just before 2 p.m.

---

[2] A second investigator named McCorvey was present during the interviews. Additional details of the interviews will be discussed in connection with appellant's first issue.

that afternoon. After again advising appellant of his constitutional rights, Allen began by telling appellant that adding up all of the statements and information pointed to him as the killer. Appellant then presented a different version of events, telling Allen that Hawkins owed a few thousand dollars to a drug supplier named Dee who either wanted to take property for the debt, or have Hawkins killed.[3] Appellant claimed he had refused to kill Hawkins but agreed to let the killer know when everyone else had left the apartment and unlock the door for him. For an hour of this third questioning session, appellant declined to give the name of the person who killed Hawkins, but eventually named a tow truck driver named Stormy as the killer.[4] Appellant never admitted to committing the murder.

Appellant was charged with murder by an indictment containing an enhancement paragraph alleging a prior felony conviction. He filed a motion to suppress seeking exclusion of his statements to police, alleging they were obtained in violation of his rights under the Fifth Amendment to the United States Constitution, Article I, Section 10 of the Texas Constitution and Articles 38.08 and 38.23 of the Code of Criminal Procedure. At a hearing on this motion, the court heard testimony from appellant, Officer Allen, and a Liberty County deputy sheriff. The State argued no *Miranda* warning was required before or during the first statement because it was not a custodial interrogation as required to trigger *Miranda*'s requirements. Appellant argued he was in custody at the inception of the first interview and the failure to advise him of his constitutional rights required exclusion of

---

[3] A second reason given for the murder was the belief that Hawkins would tell police about those he did business with if he was arrested.

[4] Allen eventually located a person known as Stormy and interviewed him. The substance of that interview is not shown in the record.

4

the statement. He also argued that violation tainted the second and third statements, requiring their exclusion. At this hearing the trial court ruled appellant was in custody after he admitted taking Hawkins's car, and excluded the remainder of the statement. This admission appeared on page 63 of the 89-page transcribed statement. The court found the second and third statements admissible. It also found each of the statements was made voluntarily.

After conducting additional research, the court reconsidered the issue at a subsequent hearing, finding all of the statements admissible. The parties proceeded to trial on this ruling, but the State did not present to the jury that part of appellant's first statement appearing after his admissions on page 63. After a six-day trial, appellant was found guilty and punishment was assessed at life imprisonment in the Institutional Division of the Texas Department of Criminal Justice. Appellant now challenges that conviction in two issues, complaining first of the denial of his motion to suppress, and second of the admission of a photograph of the victim.

Motion to Suppress

Appellant's contention that each of his statements to police should have been suppressed rests exclusively on his federal constitutional rights recognized in *Miranda* and its progeny. He does not argue on appeal the relevant provisions of the Texas Code of Criminal Procedure required their exclusion. *See* Tex. Code Crim. Proc. Ann. art. 38.22 (Vernon Supp. 2004). Nor is there a contention any of his statements were coerced or otherwise involuntary.

The requirement of *Miranda* that police advise a person of rights prior to questioning applies if the person is "in custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 445; *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). The determination whether a person is in custody within the meaning of *Miranda* must be made on a case by case basis considering all the objective circumstances. *Stansbury*, 511 U.S. at 323; *Dowthitt v. State*, 931 S.W.2d 244, 254-55 (Tex.Crim.App. 1996). A person is in custody only if, under all the circumstances, a reasonable, innocent person would believe that his freedom of movement was restrained to the degree associated with an arrest. *See Dowthitt*, 931 S.W.2d at 255.

In *Shiflet v. State*, 732 S.W.2d 622, 629 (Tex.Crim.App. 1985), the court identified four general situations which may constitute custody. They are: (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect that he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave. After the decision in *Stansbury*, the Court of Criminal Appeals clarified the fourth situation such that an officer's knowledge of probable cause must be manifested to the suspect. *Dowthitt*, 931 S.W.2d at 255. Appellant contends the third and fourth situations are applicable here. We review a trial court's ruling on a motion to suppress for abuse of discretion. *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex.Crim.App. 1996). At the hearing on a motion to suppress,

6

the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Id.*

Appellant initially points to excerpts of the first interview as evidence a reasonable person would believe he was in custody. He focuses on statements made by Officer Allen to him that he was the last person to be seen with Hawkins, and that Hawkins died before he, Albertson and Sellner left the apartment. Appellant characterizes as "threats" Allen's statement that if he did not find out exactly what happened, he would charge appellant, Albertson and Sellner, because they were the only people present at the time of Hawkins's death. Then, citing *Garza v. State*, 34 S.W.3d 591 (Tex.App.–San Antonio 2000, pet. ref'd), and *Dowthitt*, appellant concludes he was in custody at least by page 52 of the statement when he admitted to being present when, as he alleged, Albertson killed Hawkins.

The objective circumstances surrounding the first interview include the facts that appellant twice contacted police to speak with them concerning Hawkins's death, and officers transported him to the police station only because he had no other transportation. When Allen picked appellant up, Allen told his mother they would bring him back at the end of the interview. The interview was conducted at Allen's desk rather than an interview room and appellant was advised he was not under arrest, was not required to speak with the officers and was free to leave. The interview lasted less than three hours. We do not find the officer's statements cited by appellant so accusatory as to negate the effect of the advice he was free to leave. Considering the assertedly confrontational statements among

7

all the circumstances, we cannot agree they rendered Allen's questioning of appellant custodial.

Appellant urges that appellant's admission he was present during Hawkins's murder is the same admission which established custody in *Dowthitt*. The facts surrounding the questioning in *Dowthitt* are distinguishable. In that case, after twelve hours of intermittent interviews, including a polygraph examination, the defendant admitted he was present "the whole time" when the victims were killed. 931 S.W.2d at 253. As noted, Allen's first interview of appellant lasted less than three hours. In *Dowthitt*, the police disregarded the defendant's request to speak with his wife. *Id.* at 252. No similar factor is present here. When Dowthitt was told he was not going home that night, he replied "Yeah. I've known that for a long time." *Id.* at 254. Here, there was no expression by the police or appellant during the interview that he was no longer free to leave.[5] *Cf.* 931 S.W.2d at 254 (recognizing holding of *Stansbury* that the subjective belief of police or the defendant are relevant only if that belief is manifested by words or actions.) The evidence showed that on their trip to Liberty and Hardin counties to locate Hawkins's car and the other items after the first interview, appellant rode in the front seat of Allen's car and was not restrained.

Too, in the context of Allen's questioning, appellant's statement acknowledging he witnessed Albertson hit Hawkins with the baseball bat does not carry the significance of Dowthitt's admission he was present during the murder under investigation. Dowthitt initially had denied being present, giving investigators a false alibi. 931 S.W.2d at 252.

_____

[5] Unlike Dowthitt, appellant did not express a belief he was not free to leave at the end of the interview until his testimony at the motion to suppress hearing.

8

After many hours of questioning, he still denied being present during the crime. *Id*. at 253. Under the circumstances of his interrogation, and in light of his earlier contrary assertions, the court found the admission of his presence during the murder was crucial and that a reasonable person would have realized its incriminating nature. *Id*. at 256-57. Here, appellant never denied he was among the few people who were present in the apartment during the period surrounding Hawkins's death. He knew before the interview session began that Allen was aware of his presence during that time. While his admission he was present (and awake) when, he alleged, Albertson hit the victim was not insignificant, it was not such a crucial point in the interrogation as Dowthitt's similar admission. We do not agree that a reasonable person in his position would have believed he was no longer free to leave after he made that statement.

Appellant emphasizes that in *Garza,* officers reiterated the advice he was free to leave after the defendant made a critical admission. Some of the circumstances surrounding Garza's interview by police were similar to those present here. The police had given Garza a ride to the station, and he was questioned for several hours without the full panoply of *Miranda* warnings. 34 S.W.3d at 594. But police continued to question Garza after he had admitted killing his wife. *Id.* at 595. Although the court did not find it dispositive that police again told Garza he was free to leave even after he confessed to the killing, the court found it to be a distinguishing factor from the otherwise similar facts in *Dowthitt. Id*. at 597-98. Again, though, appellant's admission to being present at the murder cannot reasonably be compared to the admission by Garza that he had killed his wife.

9

Appellant also appears to contend the fourth circumstance described in *Shiftlet* applied when he admitted to theft of the victim's car at page 63 of the statement because there was clearly probable cause to arrest for that offense and the officers did not tell appellant he was free to leave. We need not evaluate that contention because the State did not present to the jury any of the statement after page 63.

Appellant also argues the trial court should have suppressed physical evidence, including the victim's car, obtained as a result of his interrogation. He relies on the Tenth Circuit's holding in *United States v. Patane*, 304 F.3d 1013 (10th Cir. 2003). However the Supreme Court has since reversed that holding in *Patane*, finding the Fifth Amendment does not require suppression of physical evidence obtained as a result of an unwarned, voluntary statement. *United States v. Patane*, 124 S.Ct. 2620, 2630, 159 L.Ed.2d 667, 675 (2004).

Appellant next contends his second and third statements should have been suppressed because they were tainted by the illegality of the first statement. We cannot agree, even assuming appellant is correct that *Miranda* warnings were required at some point during his initial session with Allen. Appellant acknowledges the holding in *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), that, unlike the Fourth Amendment exclusionary rule, the rule adopted in *Miranda* is designed to protect against a defendant's compelled testimony. 470 U.S. at 306-07. The failure to administer *Miranda* warnings simply creates a presumption of compulsion in the making of a custodial statement. *Id.* at 307. The court held when the "fruit" of a *Miranda* violation is a subsequent, properly warned and voluntary statement, exclusion is not required. *Id.* at 309.

10

In determining whether the subsequent statement was truly the result of knowing and voluntary waiver of rights, a court should consider facts such as the amount of time between the statements, change of interrogators, and change in location. *Id.* at 310. *See also Sterling v. State*, 800 S.W.2d 513, 519 (Tex.Crim.App. 1990) (setting out additional factors).

Appellant contends his case is like that considered in *Jones v. State*, 119 S.W.3d 766 (Tex.Crim.App. 2003), in which an officer engaged in what was described as a "discussion interview" with a person in custody, during which he transcribed verbatim the interviewee's oral statement, postponing *Miranda* warnings until he asked the interviewee to sign the written statement. The court described the taking of the unwarned oral statement and the warned written statement as a "nearly undifferentiated single event, taking place in the same room as an uninterrupted and continuous process," and found *Elstad* not applicable to the procedure. *Id*. at 775. We do not see appellant's second and third statements as the result of an uninterrupted and continuous process beginning with the first statement.

Nor is this case like *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601 (2004), decided after appellant's brief was filed, in which the United States Supreme Court addressed a "question-first" interrogation technique by which officers intentionally questioned a person under arrest without giving *Miranda* warnings until the suspect confessed, then gave the warnings and repeated the questioning to get the same incriminating response. *Id*. at 2606-09. Missouri argued the procedure was sanctioned by

11

*Elstad*, but the Court disagreed, finding it a "strategy adapted to undermine the *Miranda* warnings." *Id*. at 2612.

Here more than eight hours elapsed between the first two interviews, and another seven hours between the second and third. And, significantly, before giving the second statement, appellant was taken before a magistrate who advised him of his rights. The plurality opinion in *Seibert* states, "In a sequential confession case, clarity is served if the later confession is approached by asking whether in the circumstances the *Miranda* warnings given could reasonably be found effective." 124 S. Ct. at 2610 n.4. A warning given by a magistrate would in most cases be effective for this purpose, see *Sterling*, 800 S.W.2d at 520, and we see no reason to conclude otherwise here. The warnings were repeated by Officer Allen at the beginning of the later sessions.[6] Granted, appellant remained in the company of police after the first interview. However, the nature of appellant's first statement,[7] the passage of time between the statements, the changes in location without intervening questioning, and the intervening appearance before a magistrate make the circumstances here more akin to those in *Elstad* than to those in

---

[6] It merits note Allen's *Miranda* warnings were not a perfunctory recitation, but were given individually and he asked appellant if he understood each right before continuing.

[7] The Supreme Court notes in *Seibert* that when police finished with the unwarned questioning, "there was little, if anything, of incriminating potential left unsaid." 124 S. Ct. at 2612. The same cannot be said of appellant's first statement to Officer Allen.

12

*Jones* and *Seibert*.[8] We find no reversible error in the admission of appellant's recorded statements, and overrule his first issue.

## Admission of Photograph

Appellant's second issue assigns error to the admission of a photograph of the decedent. It was the fourth photograph of the victim offered by the State. The first two were personal photos of Hawkins before his death. The third was taken by police at his apartment. It shows Hawkins lying on the couch where he was killed. It was taken from the right of the couch and shows only his forearms across his chest and blanket covering the lower half of his body. His head is obscured behind a cushion. The challenged photograph also shows Hawkins on the couch and was taken from slightly left of the couch. It also shows his forearms, with blood on his left elbow. It also shows a portion of his face. At trial appellant objected to the exhibit as cumulative and "highly prejudicial in that it shows

---

[8] Appellant elsewhere in his brief argues he was motivated to give the second and third statements by "cat out of the bag" thinking. The Supreme Court declined in *Elstad* to endorse the theory that the psychological effect of a non-*Mirandized* but otherwise voluntary "disclosure of a guilty secret" requires that later disclosures be considered involuntary even though preceded by *Miranda* warnings. 105 S. Ct. at 1294-95; *see Seibert*, 124 S. Ct. at 2612 (plurality opinion) and 124 S. Ct. at 2619 (O'Connor, J., dissenting). We do not read *Seibert* to require our acceptance of such a theory here. Too, the cat appellant let out of the bag in his first statement was that he was present when Hawkins was killed. In that statement, and again in his second statement, appellant blamed the killing on Albertson. A "cat out of the bag" theory cannot explain appellant's assertions in his third statement that another person killed Hawkins with appellant's cooperation.

his face." The State responded the exhibit was relevant to establish the victim's identity and to "track that body to the morgue."[9]

Appellant cites our opinion in *Contreras v. State*, 73 S.W.3d 314 (Tex.App.– Amarillo 2001, pet. ref'd), as setting forth factors relevant to determining if admission of an exhibit of this type falls within the zone of reasonable disagreement, making the trial court's ruling supportable. *Id.* at 321. Those factors included gruesomeness, number, detail, size, color and perspective. *Id. Contreras* involved a challenge to two autopsy photographs of the victim depicting both a stab wound and large incisions made by the medical examiner. *Id.* We found them gruesome "to some extent" but not "horrifying or appalling," and overruled the challenge. *Id.* at 322.

The photograph challenged here does not show any wound and cannot fairly be characterized as gruesome.[10] Appellant does not challenge the State's asserted need to present a photograph partially showing the victim's face for purposes of identification. He did not offer to stipulate to that identification at trial. We overrule appellant's second issue.

---

[9] We perceive this to mean the State sought to have a basis for comparison with the subsequently introduced autopsy photographs.

[10] By contrast, appellant did not object to State's exhibit 72 taken during the autopsy and showing the victim's crushed skull after his scalp was removed.

14

Conclusion

Having overruled both of appellant's issues, we affirm the judgment of the trial court.


James T. Campbell
Justice


Do not publish.

15